1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,   :
                            :
      Plaintiff,            :
                            :
vs.                         :        Case No. 4:18-cr-00057
                            :
STEVEN DOUGLAS CROOK, JR.,  :        SENTENCING HEARING TRANSCRIPT
                            :
      Defendant.            :
- - - - - - - - - - - - - X

                          Courtroom, First Floor
                          U.S. Courthouse
                          123 East Walnut Street
                          Des Moines, Iowa
                          Monday, June 3, 2019
                          10:04 a.m.


BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Judge.


APPEARANCES:

For the Plaintiff:        MARC L. KRICKBAUM, ESQ.
                          VIRGINIA M. BRUNER, ESQ.
                          United States Attorney's Office
                          U.S. Courthouse Annex
                          110 East Court Avenue, Suite 286
                          Des Moines, Iowa  50309

For the Defendant:        JAMES F. WHALEN, ESQ.
                          Federal Public Defender
                          Capital Square, Suite 340
                          400 Locust Street
                          Des Moines, Iowa  50309


                KELLI M. MULCAHY, CSR, RDR, CRR
                   United States Courthouse
              123 East Walnut Street, Room 115
                   Des Moines, Iowa  50309

I N D E X

| VICTIM IMPACT STATEMENT: | PAGE |
|---|---|
| Katherine Kool-Thomes | 22 |

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 - Description of videos | 7 | 7 |
| 2 - Live.me direct messages | 7 | 7 |
| 3 - Interview | 7 | 7 |
| 4A - 4B - Interviews | 7 | 7 |
| 5 - Social worker records | 7 | 7 |
| 6 - 2016 psychological evaluation | 7 | 7 |
| 7 - 2012 psychological evaluation | 7 | 7 |
| 8 - Interview | 7 | 7 |
| 9 - (No description) | 7 | 7 |
| 10 - Facebook pages | 7 | 7 |
| 11A - 11II - Jail calls and iWeb visits | 7 | 7 |
| 12A - 12II - Transcripts | 7 | 7 |
| 13 - School records | 7 | 7 |
| 14 - Iowa DHS records | 7 | 7 |
| 15 - Iowa DHS records | 7 | 7 |
| 16 - Interview | 7 | 7 |
| 17 - Text | 7 | 7 |
| 18 - Crook iOS contacts | 7 | 7 |
| 19 - Interview | 7 | 7 |
| 20 - Live.me records | 7 | 7 |
| 21 - Interview | 7 | 7 |
| 22 - Hospital records | 7 | 7 |
| 23 - Interview | 7 | 7 |
| 24 - Jail incident reports | 7 | 7 |
| 25 - Self-assessment | 7 | 7 |
| 26 - Text message | 7 | 7 |
| 27 - SSI letter | 7 | 7 |
| 28A - 28B - Videos | 7 | 7 |
| 29 - Vlog e-mail | 7 | 7 |
| 30 - Dr. Shelton curriculum vitae | 7 | 7 |
| 31 - Report of interview | 7 | 7 |
| 32 - Report of interview | 7 | 7 |
| 33 - Transcript of interview | 7 | 7 |
| 34 - Dr. Rosell report | 7 | 7 |
| 39 - Dr. Shelton evaluation | 7 | 7 |
| 40 - Dr. Shelton testimony | 7 | 7 |
| 41 - Video | 7 | 7 |
| 42A - 42C - Audio clips | 7 | 7 |
| 43A - 43B - Audio clips | 7 | 7 |
| 44 - Photographs | 7 | 7 |

1          P R O C E E D I N G S

2          (In open court, with the defendant present.)

3          THE COURT:  Thank you.  You can be seated.

4     We are here in the matter of United States vs. Steven

5   Douglas Crook, Jr.  It's Case No. 4:18-cr-57.  The United States

6   Probation Office is represented by Pam Nelson.  The United

7   States Attorney's Office is represented by Marc Krickbaum and

8   Virginia Bruner.  They are joined by Case Agent Chris Thomas.

9   The defendant is personally present and represented by his

10  attorney, Jim Whalen.

11     Mr. Crook, do you recall being in court in December and

12  pleading guilty to four counts of a 33-count third superseding

13  indictment that was filed against you in November of 2018?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  And those four counts, which were Counts

16  1, 15, 21, and 23, each charged you with sexual exploitation of

17  a child; is that right?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Okay.  And I assume you remember that each

20  of those offenses is punishable by at least 15 years' and up to

21  30 years' imprisonment, a fine of up to $250,000, at least five

22  years and up to life on supervised release, and a $100 special

23  assessment.

24     Do you remember those penalties?

25          THE DEFENDANT:  No, ma'am.

1          THE COURT:  You don't remember them?

2          THE DEFENDANT:  No, ma'am.

3          THE COURT:  Okay.  Those were the penalties you were

4   told about at the time of your plea hearing.

5       You understand you're here today to be sentenced?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Okay.  I have received and read the

8   Presentence Investigation Report.  The most recent report is

9   dated April 29th of 2019, and it's filed at Docket 129.  I have

10  also read Mr. Whalen's sentencing memorandum and attached

11  sentencing exhibits.  They are filed at Docket 131.

12      I have also reviewed the Government's combined offense

13  conduct statement and what effectively is their sealed

14  sentencing memorandum which was delivered to my chambers in

15  February of 2019.  That document contained embedded within it

16  photographs that were redacted images from the child pornography

17  produced by the defendant with the primary victim in this case.

18      The document also had voluminous attachments.  These

19  included detailed descriptions of the child pornography videos

20  created by the defendant in this case; Live.me direct messages;

21  interviews, multiple, with the defendant; interviews, multiple,

22  with the primary victim's mother and Defendant's long-time

23  girlfriend, Kendra Hoover; interviews with DHS workers assigned

24  to the Crook/Hoover family; interviews with the primary victim's

25  teachers; school records for the primary victim; an interview

1   with the primary victim's first foster mother; hospital records;

2   interviews with a landlord; Facebook pages; text message, I

3   think that was a text message from Kendra Hoover, if I remember

4   right; iOS contacts filtered by the name Max; Polk County Jail

5   incident reports; a Social Security insurance letter from 2018

6   and the related records regarding that Social Security insurance

7   process; a rap video and vlog created by Defendant; recordings

8   of jail calls and Web visits between Defendant and Ms. Hoover;

9   psychological interviews of the defendant in 2012, 2016, and two

10  in 2018 conducted by four different doctors; a video of the

11  defendant dropping the primary victim off at a school bus; and

12  audio clips from the various child pornography videos created by

13  the defendant with the primary victim in this case.  I have

14  reviewed all of those attachments.

15       Finally, I reviewed the victim impact statements from what

16  I'll call the unrelated victims of child pornography that

17  Defendant had in his possession.  The victims in those series

18  that were identified by the National Center for Missing and

19  Exploited Children include two victims from the BluesPink

20  series, two victims from the Pink Heart Sisters series, and then

21  the victim from the Tara series.

22       Mr. Krickbaum, did you have an opportunity to review the

23  presentence report on behalf of the United States?

24            MR. KRICKBAUM:  Yes, Your Honor.

25            THE COURT:  And based on the sentencing memorandums,

1    it appears that I'll need to resolve two guideline issues;

2    first, whether the defendant should receive an obstruction of

3    justice enhancement, and, second, whether the defendant should

4    receive a reduction for acceptance of responsibility.

5         From the Government's perspective, any other contested

6    guideline matters to be resolved today?

7              MR. KRICKBAUM:  No, Your Honor.

8              THE COURT:  Okay.  Mr. Whalen, did you have a chance

9    to review the presentence report with your client?

10             MR. WHALEN:  Yes, I did, Your Honor.

11             THE COURT:  And can you briefly outline how you

12   accomplished that?

13             MR. WHALEN:  I read the presentence report to him

14   verbatim, discussing it as we went along.

15             THE COURT:  And can you -- I'm sorry.  Are there any

16   issues to be resolved, guideline issues, other than the two I

17   outlined with Mr. Krickbaum?

18             MR. WHALEN:  No, Your Honor.

19             THE COURT:  Okay.  Mr. Crook, did you have enough time

20   to review your presentence report with Mr. Whalen?

21             THE DEFENDANT:  Yes, ma'am.

22             THE COURT:  Okay.  Have you been happy with him as

23   your lawyer?

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  All right.  Let's talk, then, about

1  obstruction of justice first.  This is an adjustment that the

2  United States bears the burden of establishing by a

3  preponderance of the evidence.

4      Mr. Krickbaum, do you have any evidence or argument you'd

5  like to offer?

6          MR. KRICKBAUM:  Judge, our only evidence is contained

7  in the exhibits that the Court already summarized which were

8  attached to the offense conduct statement.  And then there's --

9  so at this point I think I'll just offer all of them because

10  some of them were related to 3553(a) factors.  So it's

11  Government's Exhibits 1 through 34 and 39 through 44.  44 is a

12  new one that I added this morning.  But we would offer those,

13  and then I'm happy to argue based on that, Judge.

14          THE COURT:  And I hadn't looked at your description of

15  44.

16          MR. KRICKBAUM:  It's three photographs taken from

17  Facebook records.  And I'm just going to discuss those as part

18  of my 3553(a) argument.  They don't relate to the guidelines

19  issues.

20          THE COURT:  Mr. Whalen, any objection to Government

21  Exhibits 1 through 44?

22          MR. WHALEN:  No, Your Honor.

23          THE COURT:  I'll admit them.

24              (Government Exhibit Nos. 1 - 34 and 39 - 44

25               were offered and received in evidence.)

1          THE COURT:  Some of these will need, obviously, to be

2    sealed because they contain pictures of the primary victim or

3    identify the names of the victim or her siblings or other things

4    of that nature.  We can figure that out later.

5          MR. KRICKBAUM:  My intention, Your Honor, unless the

6    Court thinks differently, is to offer them all under seal.  They

7    either involve information the Court just outlined or

8    psychological information about the defendant.  I think they're

9    all sensitive and should be sealed.

10          THE COURT:  Any objection to that?

11          MR. WHALEN:  No, Your Honor.  We concur in that.

12          THE COURT:  Okay.  Then I'll accept all Government

13    Exhibits 1 through 44 under seal.  A number of these contain

14    subparts, and so I will also include as part of that package the

15    Government's exhibit list.

16      Any objection to us having the exhibit list itself be

17    public?

18          MR. KRICKBAUM:  No objection.

19          MR. WHALEN:  No objection.

20          THE COURT:  Okay.  So we'll file the exhibit list

21    publicly just so people are aware of what the pieces are that

22    are sealed, including, you know, if the Court of Appeals needs

23    any information or later counsel might need information.  We'll

24    leave that information available publicly, but the exhibits

25    themselves will be sealed.

1          MR. WHALEN:  Your Honor, I would point out there is

2     a -- in Exhibit 32, it's listed as a report on an interview with

3     the child's mother that could conceivably lead people to be able

4     to identify the victim in this case.

5          THE COURT:  Okay.  We will get that redaction made.

6          MR. WHALEN:  Same thing on Exhibit 33, Your Honor.

7          THE COURT:  I see that one.  We'll do that one as

8     well.  We may want to redact out the name of the school the

9     child attended as well.  We'll take a look at those issues as we

10    go, and we'll get those resolved at a later time.

11         Mr. Whalen, anything you would like to offer by way of

12    evidence or argument regarding the obstruction of justice issue?

13         MR. WHALEN:  No, Your Honor.  We have no exhibits, and

14    I've set out our argument in our written brief, which I know the

15    Court has read.

16         THE COURT:  Thank you, Mr. Whalen.

17         I do find by a preponderance of the evidence that the

18    adjustment under 3C1.1 should be applied in this case.  I do

19    find the defendant willfully obstructed and impeded or attempted

20    to obstruct and impede the administration of justice with

21    respect to the prosecution of this case by feigning his

22    incompetency.

23         Defendant deliberately created an alternate personality to

24    blame for his criminal behavior.  He malingered for months

25    throughout psychological testing.  He attempted to influence his

1    girlfriend to assist with his ruse by coaching her in various

2    telephone calls to report certain mental deficiencies that he

3    did not, in fact, possess.

4        He went so far as to smear feces around his mouth and

5    committed other types of disruptive behavior, injuries to

6    himself and other things, in an effort to be found incompetent.

7        All of these efforts were willful and were aimed at

8    preventing his imprisonment.  Case law supports an adjustment

9    for this type of behavior, and I do find it's appropriate in

10   this case.

11       Let's turn next to the issue of acceptance of

12   responsibility.  The defendant bears the burden of establishing

13   this particular adjustment.

14       Mr. Whalen, do you have any evidence or argument on this

15   issue you'd like to present?

16           MR. WHALEN:  Your Honor, no evidence.  The Court's

17   well aware of the plea agreement in this case.  The Court is, I

18   think, also aware of the fact that if the defendant had not

19   decided to enter a plea of guilty, the Court was going to be

20   conducting a fairly lengthy trial that would have involved the

21   presentation of some videos and other evidence that would have

22   been quite repulsive to the jury.

23       I think this is a case where there was serious reason for

24   concern about the welfare of the jurors and court personnel who

25   would have been required to see these exhibits as part of the

1  evidence in this case.

2      By pleading guilty, Mr. Crook saved the Court and the

3  prosecution the time and trouble of conducting the trial and,

4  perhaps more importantly, saved court personnel and potential

5  jurors and actual jurors the trauma that might have been visited

6  upon them by actually seeing these images.

7      Mr. Crook, by pleading guilty, also completely eliminated

8  any possibility that the victim might have to testify.  Frankly,

9  I don't know if this is a case where the Government would even

10 have been thinking about putting the victim on the stand.  They

11 certainly had evidence that I think might have made it not so

12 important for them to call her to testify.  But nevertheless,

13 that was a factor in Mr. Crook's decision to enter the plea.

14     So I think this may be one of those extraordinary cases

15 where, due to the nature of the offense and the evidence that

16 would have been necessary to prove that offense at trial,

17 Mr. Crook qualifies both for the increase in obstruction that

18 the Court has given him but also qualifies for a reduction for

19 acceptance of responsibility.

20         THE COURT:  Thank you, Mr. Whalen.

21     Mr. Krickbaum.

22         MR. KRICKBAUM:  I'll just be brief, Judge.  The Eighth

23 Circuit has identified extraordinary cases as those in which the

24 obstruction is more of an isolated incident or some kind of

25 limited, contained conduct.  This obstruction was the exact

1   opposite, and so we don't think this is such an extraordinary

2   case for reasons we explained in our written briefing.

3        I don't have anything else to add to that.

4             THE COURT:   Thank you, Mr. Krickbaum.

5        As the parties are certainly aware, and as they said in

6   their briefing, Sentencing Guideline 3E1.1 provides for a

7   two-level decrease in the offense level for defendants who

8   clearly demonstrate acceptance of responsibility for their

9   offense.   A defendant who obstructs justice is not ordinarily

10  entitled to a reduction for acceptance of responsibility except

11  in an extraordinary case, as Mr. Whalen said.

12       The Eighth Circuit has set forth factors that a judge is to

13  consider in cases where there's been an obstruction finding and

14  acceptance is sought.   Those are generally known as the Honken

15  factors, and among them are the questions of whether the

16  obstruction was isolated, an isolated incident early in the

17  investigation or an ongoing effort to obstruct the prosecution;

18  whether the defendant voluntarily terminated the conduct or

19  whether the conduct was stopped by law enforcement; whether the

20  defendant admitted and recanted his obstructive conduct or

21  whether he denied obstruction of justice at the time of

22  sentencing.

23       And I agree with everything Mr. Whalen has said about

24  Mr. Crook saving a jury from having to see this material, from

25  saving potentially a child from having to testify, although I

1  think the reality is she would never have been called as a

2  witness, but certainly saving her privacy from being violated

3  yet again when a whole group of new people saw those images.

4      But, unfortunately, those considerations don't fit into the

5  Honken analysis anywhere, and, as Mr. Krickbaum said, every one

6  of the questions that is part of the Eighth Circuit's analysis

7  is answered in the negative when you look at the defendant's

8  behavior.

9      The obstruction wasn't isolated.  It was comprehensive, it

10  was protracted, it was resource-intensive.  It was a long-time

11  ruse aimed at escaping all responsibility for his crimes, and it

12  was extreme, really as extreme as I can imagine short of

13  murdering a witness.  It was as extreme as I've ever seen.  He

14  created a whole second personality.  He stuck to it.  He, you

15  know, went through all of these evaluations faking his way

16  through symptoms.  And, as I said, it was extreme behavior.

17      You know, you look at the next factor, he didn't

18  voluntarily terminate that obstructive conduct.  He simply

19  eventually got caught by every expert, including his own,

20  really, trying to feign symptoms and exaggerate symptoms that he

21  didn't have.

22      And eventually, just nobody believed him anymore, and I

23  found he was competent, and so at that point the obstruction --

24  or the obstructive conduct stopped.  But he certainly at no

25  point sort of went, "All right, all right, you got me.  There is

1  no Jeff.  I was trying to get away with something."  He didn't

2  give that up voluntarily, and I imagine that he'll continue to

3  fight about that for a very long time.

4      And even coming into today's sentencing, he was still

5  arguing about whether or not he had obstructed justice, and so

6  it's hard to give him the benefit of acceptance of

7  responsibility under that Honken analysis.

8      So I do find, because it was his burden, that he has failed

9  to prove by a preponderance of the evidence that he's entitled

10 to a reduction for acceptance of responsibility.  But I do, as I

11 said to him at the time of his plea hearing, find that this was,

12 his decision to plead, the first kind thing, perhaps, that he

13 did for his daughter in all of the years that she's been alive,

14 and I appreciate his willingness to do that.  It just isn't

15 something that legally earned a 3E1.1 reduction in this case.

16     So based upon those rulings, I do, then, adopt the

17 guideline calculation contained within the presentence report.

18 For Count 1, that means we have a base offense level of 32.

19 There is a four-level increase because the victim was under the

20 age of 12.  Here she was 6 and under.  There's a two-level

21 increase because the offense involved the commission of a sex

22 act.  There is a four-level increase because the offense

23 involved sadistic and masochistic images and conduct.  There's a

24 two-level upward adjustment because the defendant was the parent

25 of the victim.  There's a two-level upward adjustment for

1   obstruction of justice.  And there's no reduction for acceptance

2   of responsibility.  So on Count 1, we've got a total offense

3   level of 46.

4       For Count 15, we start at a 32.  We have a four-level

5   increase because of the age of the child, a four-level increase

6   on this one rather than a two because the offense involved the

7   commission of a sex act defined under 18 U.S.C. 2241, a

8   two-level increase because the defendant distributed that child

9   pornography, a four-level increase for sadistic and masochistic

10  conduct, a two-level upward adjustment because the defendant was

11  a parent of the victim, a two-level increase for obstruction, no

12  reduction for acceptance of responsibility.  That leaves Count

13  15 at a total offense level of 50.

14      For Count 21, we have a base offense level of 32.  There's

15  a four-level increase for age, four levels for commission of a

16  sex act defined by 18 U.S.C. 2241, four levels for sadistic and

17  masochistic conduct, two levels because the defendant was a

18  parent of the victim, two levels for obstruction, no acceptance.

19  That gives us a total offense level on Count 21 of 48.

20      For Count 23, we have a starting base offense level of 32.

21  There's a four-level increase because of the age of the child, a

22  four-level increase because the offense involved a sex act

23  defined under 18 U.S.C. 2241, a four-level increase because the

24  offense involved sadistic and masochistic conduct, a two-level

25  increase because the defendant was the parent of the victim, a

1  two-level increase for obstruction of justice, no reduction for

2  acceptance of responsibility.  That gives us a Total Offense

3  Level 48.

4      There's then a multiple-count adjustment that adds four

5  levels to each of the counts.  This gives us a combined adjusted

6  offense level of 54.

7      There's then an additional five-level increase because the

8  defendant has engaged in a pattern of activity involving

9  prohibited sexual conduct.  That creates a new offense level of

10 59.

11     However, the sentencing guidelines instruct that in the

12 rare instances where the total offense level is higher than 43,

13 the guideline is to be reduced to 43.  So this results in a

14 16-level decrease, from 59 to 43.  So at the end we have a total

15 offense level 43.

16     I would note that given this large overage, even if I had

17 not found obstruction and had given acceptance of

18 responsibility, the defendant would have still ended up at a

19 Total Offense Level 43 because he still would have been 11

20 levels over the total offense level cap.

21     Defendant is a criminal history category of III.  This

22 would ordinarily result in an advisory guideline range of life

23 imprisonment, but because there is a 30-year statutory maximum

24 on each count, the range essentially becomes 360 months'

25 imprisonment to 360 months' imprisonment on each count for a

1   total sentence of 120 years or 1,440 months' imprisonment.

2        Mr. Krickbaum, are there any victims who wish to be heard

3   before sentencing is imposed in this case?

4             MR. KRICKBAUM:  Judge, the original -- I should say

5   the foster mother who originally fostered all three of these

6   children wishes to speak on the victim's behalf.

7             THE COURT:  And I know the parties and I exchanged

8   some e-mails over the weekend about this.  I know Mr. Whalen has

9   an objection to this particular statement, in part because of an

10  argument that the siblings of the primary victim are not, in his

11  view, victims in this case.

12       Mr. Whalen, do you want to make whatever statement you'd

13  like to make or record you'd like to make at this time?

14            MR. WHALEN:  Thank you, Your Honor.  Yes.

15       We object to the reading of this alleged victim impact

16  statement for a couple of reasons.

17       First of all, I do not believe that the siblings constitute

18  victims as that term is defined under Section 3771.  I don't

19  believe that they are individuals who were directly or

20  proximately harmed by the commission of the federal crime

21  involved here.

22       It's true they may have been subject to neglect, they may

23  have been subject to other types of abuse, but there is no

24  evidence to show that they were victims of the federal crime --

25  the federal crimes for which the defendant was convicted.

1     I also object to the statement, at least the advance copy

2  of the statement that I was given, in that it is stating or

3  suggesting that the defendant sexually abused people other than

4  the primary victim in this case, and I don't believe that there

5  is any evidence in the record, at least none that I have been

6  made aware of, that shows that that is, in fact, true.

7     I think that the defendant has a right, under the due

8  process clause of the Constitution, not to be sentenced based

9  upon information that is factually erroneous, so to the extent

10  that this statement, this victim impact statement, contains

11  those allegations, we also object to it on those grounds.

12     I also object to this victim impact statement because I

13  don't think it is a proper victim impact statement.  It is

14  basically the foster mother venting her own anger and revulsion

15  towards the defendant.  I don't think that name-calling of the

16  sort that we're going to hear here in this statement this

17  morning in any way advances the goals of sentencing, and I think

18  that it detracts substantially from the dignity and the gravity

19  of proceedings like this.

20     So those constitute our objections to the victim impact

21  statement, at least the version that we have been made aware of

22  prior to this hearing.

23     Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Whalen.

25     Mr. Krickbaum, can you speak to the issue of the

1    accusations that Mr. Crook sexually abused other people?

2             MR. KRICKBAUM:  Yes, Your Honor.

3        So I do think there is some of that material contained in

4    what you will hear from Ms. Thomes today if you choose to hear

5    from her.  And it is true we have not presented evidence of such

6    abuse.  I think Ms. Thomes' understanding of that abuse is based

7    on two things; it's based on things that the primary victim has

8    told her happened, and it is based on her observation of the

9    behavior of the other children.

10       I think she has a good basis for believing what she

11   believes, but to be clear, we are not going to ask the Court to

12   rest its sentence on allegations that the defendant sexually

13   abused the other children.  In fact, we would ask the Court to

14   specifically not rest its sentence on such allegations.

15       However, Ms. Thomes explaining what the victim has told her

16   I think is proper.  It's proper in, if nothing else, explaining

17   to the Court the impact of this crime on the victim; that

18   whether these allegations are true or not, I think what the

19   Court has already seen and will see is that this victim has been

20   highly sexualized by the crimes that the defendant committed

21   against her.  And just the fact that she speaks of these acts

22   and is aware that they exist shows how this crime has affected

23   her and how, as a 7-year-old, she speaks in ways that are

24   unrecognizable based on her age.

25       So I want to be very clear.  We are not asking the Court to

1  make a finding that the defendant abused the other children, but

2  whatever the victim said to the foster mother about that I think

3  is fair for her to speak about in her victim impact statement.

4      I do think the boys were at least proximately harmed by the

5  crime in this case because of the chaos and abuse that was

6  rampant in that home, even if it was only directed toward the

7  oldest victim.

8      I also expect you will hear, Judge, from Ms. Thomes that

9  the victim herself has acted out sexually against her brother,

10  at least one of her brothers, after being taken from that home,

11  which is not something we have dwelled on in this courtroom

12  because I have wanted to be very careful about what we say about

13  this victim.  But that is the reality that I think Ms. Thomes

14  will discuss, that that happened while those kids were in her

15  home.  And if that is true, that is also a proximate harm that

16  these boys have suffered because of this crime.

17      And so as the Court is well aware, the Court is authorized

18  to hear widespread evidence at sentencing.  Essentially, it has

19  to be relevant in a very broad way and it has to be minimally

20  reliable, and the Court is, I think, capable of making a

21  determination about what it can and should rely on and what it

22  cannot and should not rely on, but you can't make that

23  assessment until you've heard from Ms. Thomes, so we would ask

24  the Court to let her speak.

25          THE COURT:  Mr. Whalen, any additional thoughts?

1      MR. WHALEN:  Your Honor, will I be allowed to

2  cross-examine Ms. Thomes?

3      THE COURT:  Ordinarily, a victim impact statement

4  isn't one that's given under oath or given with

5  cross-examination.  Is there a particular concern that you have,

6  Mr. Whalen?

7      MR. WHALEN:  Insofar as she is relating her belief

8  that the defendant sexually abused the other two children.

9      THE COURT:  I don't intend to rely on any belief that

10  the defendant sexually abused either of the boys.  I won't rely

11  on that information.  Even if she had good, solid information

12  about that, I wouldn't rely on that at this point.  We're well

13  past that stage in the case where that would be fleshed out and

14  you would have time to investigate it.

15      Now, I do think she has the right to talk about what she

16  observed in the home of sexualized behavior from the children,

17  particularly from the victim -- or the primary victim, I should

18  say.  I do think she has every right to describe what the

19  primary victim told her.

20      I do think the siblings are proximate victims in this case,

21  as I said in my e-mail exchange with the parties this weekend.

22  You know, they were removed from this home because of the

23  conduct of the parents, the defendant most particularly.  They

24  were claimed to be injured by the victim by the defendant

25  himself.  The defendant claimed to DHS and teachers that the

1   victim had to be punished in certain ways or treated in certain

2   ways because she was violent towards her brothers so he used her

3   activities with her brothers as excuses to abuse the victim.

4       I think all of that makes them proximate victims in this

5   case, and Ms. Thomes is a logical person to speak on their

6   behalf, given that their mother is in prison, their father is

7   the abuser in this case, or one of them, and she is the person

8   who's primarily been caring for those children for large

9   portions of their life after they were removed from the home.

10      So those are my thoughts.  But anything else you'd like to

11  add to the record, Mr. Whalen?

12          MR. WHALEN:  No, thank you, Your Honor.

13          THE COURT:  Okay.

14      Ms. Thomes.

15      And, Ms. Thomes, if you could tell us your name.

16          MS. KOOL-THOMES:  My name is Katherine Kool-Thomes.

17          THE COURT:  Is Katherine with a K?

18          MS. KOOL-THOMES:  Yes.

19          THE COURT:  And did you say, then, Kool?

20          MS. KOOL-THOMES:  K-o-o-l and hyphen Thomes, and

21  Thomes is with an e-s, T-h-o-m-e-s.

22          THE COURT:  Okay.  Thank you.  Go ahead.

23          MS. KOOL-THOMES:  Okay.  I'll just start here.

24      Okay.  We became the foster family to the three oldest

25  Crook children on July 23rd of 2018.  We were warned of

1  behavioral issues due to sexual abuse, neglect, and trauma, but,

2  honestly, we had no idea of the severity of it all.

3      The oldest victim was extremely sweet at first, but then

4  she started to act out sexually and physically on her brothers,

5  and she became very destructive of other children's property.

6      She and I became very close, and she opened up to me about

7  the horror that she had lived with before entering foster care.

8  She told me about the physical and sexual abuse that she

9  suffered from both of her parents.

10      She talked about how Mr. Crook would rape her in both of

11  her areas.  She called the part of her body that her underwear

12  covered her "area."  She told me about the awful pain that she

13  felt when this happened to her.  She told me about the time that

14  he tied her to a bed and raped her.

15      In a very matter of fact way, she told me that her mom

16  taught her how to perform oral sex on her brother.  She

17  explained that her parents would watch her do sex acts with her

18  brother.  She also told me how she watched Mr. Crook put his

19  area in her brother's back area.  She tried to make him stop

20  with no avail.  She told me about how Mr. Crook would suck on

21  her brother's wee-wee until he would potty in Mr. Crook's mouth.

22      As she would talk about these dreadful experiences, she

23  would cry, get angry, or sometimes she was very serious.  It was

24  extremely heart-breaking.

25      In October we found out that she'd been performing sexual

1   acts on her oldest brother every chance she could get.  She was

2   also caught with her hand down her youngest brother's diaper.

3   She completely admitted to all this and explained that she

4   couldn't stop.  It was then with a heavy heart that I had to ask

5   for her to be moved to a different foster home.  I was and still

6   am very sad about that, but I have to protect the other

7   children.

8        She has now become a predator because of what her parents

9   did to her and made her do.  I still remain a support in her

10   life, and I love her very much.  All I want is for her to be

11   happy and to have a successful life despite what was done to

12   her.

13       When the oldest boy came to live in my home, he was very

14   angry and barely spoke.  He would have violent outbursts several

15   times a day.  He had night terrors almost nightly.  He's doing

16   amazing now.  The outbursts and night terrors have lessened, and

17   academically he's doing great, and he's an absolute joy to be

18   around.

19       The youngest boy came to us completely nonverbal and

20   extremely angry.  He was very violent and had unstable mood

21   swings.  He's come a long way in those areas, but he still has a

22   lot of work to do.  My hope for him is that through continued

23   therapy and some behavior modification techniques that he'll

24   become a happy, normal 2-year-old.

25       I absolutely love these children.  I pray that they will be

1  able to move past the years of abuse and trauma and be happy,

2  successful adults and not be victims for the rest of their life.

3      I have never been in the presence of such evil as I am

4  right now.  You, Mr. Crook, are a child-raping monster with

5  absolutely no redeeming qualities.  What you did to your

6  children is unforgivable.

7      A father is supposed to protect his children, not abuse

8  them in the worst possible ways.  You stole from them a sense of

9  security that all children deserve from their parents.  You

10  preyed on innocent babies for your revolting pleasure.  Those

11  innocent babies looked to you for safety, guidance, and love.

12  All they got were years of abuse and emotional scars that will

13  last a lifetime.

14      I have made it a goal of mine to erase as much of you from

15  their memory as possible.  Thankfully, the boys don't even know

16  who you are.  You'll be just a horrible man in their past.

17  Unfortunately, your oldest victim will never be able to forget

18  the nightmare that you put her through, but hopefully, through

19  time and therapy, she can get past the horrific consequences of

20  your sick abuse and have a successful life.

21      These children deserve -- did nothing to deserve this

22  abuse.  They didn't deserve to be raped and sodomized.  They

23  didn't deserve to live in constant fear of what kind of abuse

24  would be inflicted on them next.  They didn't deserve to have to

25  live in the conditions that they did.

1       What they do deserve is how they are living now.  They are

2   happy, healthy, and protected from sick people like you.  They

3   are loved, nurtured, and doted on.  They now know what a real

4   daddy is.  They run into my husband's arms yelling "Daddy" when

5   he gets home from work at night.  They know that he loves them

6   and he would never hurt them.

7       I will leave you with this:  You are nothing more than a

8   sick, perverted, twisted monster that deserves to spend the rest

9   of your life rotting in prison and eternity in hell.

10          THE COURT:  Ms. Thomes, it's incredibly difficult to

11  be a foster parent, to love a kid the way they deserve to be

12  loved knowing that they might have to leave your home at some

13  point, to love a child not knowing what happened to them before

14  they arrive in your home, to not understand why they're

15  terrified of the bathtub or when the microwave dings they

16  scream, or all of -- you know, earthworms can make them

17  terrified.  You just -- they are mysteries.

18      But children are incredibly resilient, and when you love

19  them and you care for them, they can heal.  I'm really glad that

20  these children landed with somebody who loves them and protects

21  them.  I'm grateful there's good foster parents out there

22  because, as you know, there's bad ones too who do this fostering

23  for all the wrong reasons.

24      I know that you're very full of hate right now.  I would be

25  too if I were in your position.  He's not in a position to hurt

1   them again so you can let that go and move forward, hopefully.

2       Thank you for being here today.

3           MS. KOOL-THOMES:   Thank you.

4           MR. KRICKBAUM:   Judge, can I just add -- thank you,

5   Ms. Kool-Thomes very much.

6       Given the objection, I just want the record to be clear

7   about what we are and are not asking the Court to rely on from

8   Ms. Kool-Thomes, and I think that probably the simplest way to

9   explain it is any allegations that the victim has reported,

10  either about Mr. Crook or about Ms. Hoover, that are not already

11  contained in what I would call the objective evidence, being the

12  videos and photos that we have presented to the Court, we're not

13  relying on that any of those incidents happened and we're not

14  asking the Court to sentence him based on a finding or a hunch

15  that any of those incidents happened.

16      The reason that her statements, as I've already said, are

17  relevant is because they show, whether they are true or not,

18  what thoughts are going through this 7-year-old girl's mind

19  because of the abuse that we know she suffered.  And so I just

20  want the record to be clear that's what we're offering and what

21  we are not offering.  And I suspect that the Court's sentence

22  will rest on, I know that it will, the objective evidence and

23  the exhibits rather than these reports.

24          THE COURT:   Now that I've heard the statement, I

25  understand more of Mr. Whalen's concerns.  I think I know that

1  what I will rely on from Ms. Kool-Thomes' statement is really

2  just a showing that the crime against this little girl, she's

3  not magically better the minute she leaves the home.  The minute

4  that Crook is locked up, she is not suddenly better.

5      And all of us, I think, who do these jobs understand that,

6  that she's not ever going to be magically healed from everything

7  that happened to her; that she continues to have difficulties

8  interacting with all kinds of people, including her own

9  brothers.

10     But I will say the allegations that she has reported to

11 Ms. Kool-Thomes are not consistent with what we know from the

12 evidence in the file, but they are, again, consistent with a

13 child who's having very serious adjustment issues, which is what

14 you'd expect given what she went through that we know about from

15 the file.  So that's how I take it is just a child who's been

16 damaged and continues to be damaged.

17          MR. KRICKBAUM:  Thank you, Your Honor.

18          THE COURT:  Mr. Krickbaum, any other victim

19 statements?

20          MR. KRICKBAUM:  No, Your Honor.

21          THE COURT:  In this case we do have what I'll call the

22 NCMEC victims, those that were identified by the National Center

23 for Missing and Exploited Children from the more nationally

24 known, I guess, series of child pornography that were also

25 involved in this case.

1          I know restitution has been sought from three series in

2     those NCMEC cases, five victims total in those three series.

3     Has there been any agreement between the parties about how much

4     restitution is being sought, or what is the Government's

5     position on that?

6              MR. KRICKBAUM:   Judge, we haven't actually discussed

7     that, the parties have not.   And I'll be very blunt with the

8     Court.   The Government's focus in its advocacy at this

9     sentencing hearing has been on the sentence of incarceration.

10         If there were to be restitution ordered in this case, I

11    think the priority should go to Mr. Crook's daughter.   We have

12    not sought to estimate the restitution for her.

13         Ordinarily, the defendant's ability to pay is, of course,

14    not relevant, and I understand that.   From a practical

15    perspective, I expect Mr. Crook to spend the rest of his working

16    life, and the Government hopes the rest of his natural life, in

17    federal prison.   He has also never worked, according to his own

18    statement, a day in his life.

19         And so the primary victim in this case, her counseling is

20    currently being paid for by the State of Iowa and will be until

21    she turns 18.   She, of course, is going to need counseling for

22    the rest of her life, but whatever pittance Mr. Crook could

23    contribute to that I think would be a pittance.

24         And so while I do not mean to diminish the importance of

25    restitution, in this case it would be truly symbolic, and we

1  have not focused our attention on it or our advocacy efforts on

2  it, and so I don't have anything more to add on the restitution

3  issue, Judge.

4         THE COURT:  Okay.  Here's the problem, though:  I have

5  actual restitution requests from the NCMEC people.

6         MR. KRICKBAUM:  I understand.

7         THE COURT:  I don't have any request on behalf of the

8  daughter.

9         MR. KRICKBAUM:  I understand, Your Honor.

10         THE COURT:  Okay.  Mr. Whalen, any thoughts with

11  respect to restitution?

12         MR. WHALEN:  Yes.  I agree in many ways with

13  Mr. Krickbaum's characterization of this issue.  It, frankly,

14  has not been a primary focus of the parties in this case.

15      I would point out that the restitution to the NCMEC victims

16  is not mandatory.  It is discretionary.  And I think when

17  considering discretionary restitution, the Court can and should

18  take into account the defendant's ability to pay.  Whether --

19  even if Mr. Crook somehow manages to get a job that pays him

20  some small sum while in prison, the odds of him ever being able

21  to make significant restitution payments to anyone are extremely

22  remote.

23      So I would suggest that this would be an appropriate case

24  for the Court to exercise its discretion and not order

25  restitution to the NCMEC victims in this case, the ones that

1   you've received a claim from.

2          THE COURT:  Okay.  Mr. Krickbaum, what's the

3   Government's recommendation regarding a sentence in this case?

4          MR. KRICKBAUM:  Judge, could we turn on the

5   Government's laptop?  Just because there's a couple of these

6   photos that I would like to review.

7          THE COURT:  Yes.  And I assume you're not using any --

8   or you're not presenting any what I would call contraband --

9          MR. KRICKBAUM:  No, Your Honor.

10          THE COURT:  -- kinds of images.

11          MR. KRICKBAUM:  No, I am not.

12          THE COURT:  Okay.

13          MR. KRICKBAUM:  Judge, our position was set forth in

14   the plea agreement, it was set forth in our offense conduct

15   statement, and it is that Mr. Crook should spend the rest of his

16   life in federal prison.  I have actually never advocated for

17   such a sentence before for a defendant that I have personally

18   prosecuted.  I believe in Mr. Crook's case, it is more than

19   appropriate.

20       This first photo that I have on the screen, which is part

21   of Government's Exhibit 44, in a lot of ways for me helps me

22   think about this case.  This is the victim.  Her name is Bianca,

23   and I will use her name in talking about the sentence.

24       She is with her grandmother, that is Kendra Hoover's

25   mother, and this, on its surface, appears to be a very ordinary

1  photo of a little girl playing in the backyard with Grandma.

2  But there is a shadow cast over her by the defendant, Mr. Crook,

3  and from her infancy, he cast a shadow over her life.

4      When she first came into this world, he began sexually

5  abusing her, and he began raping her when she was a baby, and he

6  began taking photographs of her.  And so Bianca, from her

7  earliest days, well before she was able to form memories, knew

8  nothing other than a life in which her father treated her in

9  this way.

10     I have thought about what life must have looked like from

11 her perspective, and just thinking about the physicality of it,

12 Mr. Crook was a huge man, and certainly to a child, he was

13 enormous.  And the knowledge that within the home where she was

14 trapped, at any moment, at any time, any day, he could take her

15 body and do whatever he wanted to with her any time from the

16 time before she could remember until the time that Chris Thomas

17 rescued her from that house, that is impossible to imagine what

18 that looks like for a little girl.

19     Now, there have been -- I have categorized four arguments

20 that the defense has made in favor of leniency here, and I want

21 to talk briefly about each of them.

22     The first is that, we've already discussed it, the

23 defendant pled guilty and spared everyone a trial.  And that is

24 true.  And I have watched -- Ms. Bruner and Special Agent Thomas

25 and I have watched these videos.  We had to watch them multiple

1   times in order to prepare for this trial, and I would not wish

2   watching these videos upon my worst enemy.  And so we offered

3   Mr. Crook a plea to four counts because if we had proceeded to

4   trial, not only the jurors and the Court and the court staff,

5   all of those people would have been traumatized by watching

6   those videos; not made sad, not shed a tear or felt badly or had

7   a bad day, they would have been traumatized.

8       Now, the defendant is the one who created that evil, and

9   there is something perverse about the idea that because he

10  created that, because he made it and took such pleasure in

11  livestreaming it on the Internet, that we would grant him

12  leniency for not making us watch it.  That actually doesn't make

13  any sense.

14      He did something that is so horrible that we can't even

15  contemplate it.  It does not make sense to show him leniency

16  because we were able to avert our eyes because it happened, all

17  of it happened.  And that should be the basis for the Court's

18  sentence, not the fact that we didn't create new victims of this

19  trauma by innocent jurors being able to avoid having to watch

20  it.  The thanks that the defendant has gotten from this Court

21  should be the end of it in terms of leniency.

22      The second argument is that the defendant has low

23  intellectual functioning, and that is true, and it does not

24  matter one bit in this case.  Because what the Court needs to

25  know about the defendant's intellect is that he was smart enough

1   to commit these crimes for all six years of his daughter's life.

2   He was smart enough to manipulate her, to remain silent about

3   it.  He was smart enough to hide it from his wife and from his

4   daughter's teachers and from members of the community so that he

5   could keep doing it.  He was smart enough to use Live.me and

6   livestream it over the Internet.

7        And that is what you need to know about the defendant's

8   intellectual capabilities.  His IQ at this point does not

9   matter, and it's not mitigating.

10       The third argument is that the defendant himself was abused

11  as a child, and he was.  And I read those court documents that

12  Mr. Whalen attached to his sentencing memo, and what they depict

13  is a horrific scene in those trailers in Texas.  And I have no

14  doubt -- it would be shocking if the defendant were not a victim

15  of sexual abuse, and there is no question in my mind that he

16  was.

17       I think when you're trying to evaluate that and how that

18  fits into this case, you can kind of get to a moral impasse.

19  You know, what do I do with the fact that this man was once

20  himself a victim?  It's a troubling issue that comes up

21  frequently.

22       And I guess I think about it in two ways.  If you think

23  that the defendant's abuse that he suffered as a child somehow

24  makes him not responsible or perhaps, more plausibly, less

25  responsible for his actions as an adult, if you think that, then

1  you should still put him in federal prison for the rest of his

2  life because even if the defendant's childhood experiences

3  essentially made him into a robot who has no choice over his

4  actions but who uncontrollably rapes children and he can't help

5  it, even if that's the case, he should remain behind bars

6  forever.  And I don't care if he's 69 or 79 or 89 or 99, the

7  defendant should never again be out in the world and encounter a

8  child ever.

9       But in the Government's view, it is not true or accurate to

10 say that the defendant is not responsible for his crimes.  He

11 is.  And I guess that takes me to the fourth argument from the

12 defense, which is that maybe Mr. Crook did not know that what he

13 was doing was morally wrong, and that is false.

14      Mr. Crook told Special Agent Thomas when he was interviewed

15 that he knew what he was doing was morally wrong.  He said a

16 father is not supposed to do that with his daughter, which is

17 not a complicated moral concept to understand.

18      But the suggestion from the defense has been that, well,

19 maybe Mr. Crook thought that because he wasn't using force what

20 he was doing wasn't morally wrong.  He was using force.  We have

21 summarized the video where he tells Bianca to change positions

22 while he's raping her, and when she says she doesn't want to

23 move, he says, "You don't want me to force it in again, do you?"

24      He tells her that if she doesn't move exactly how he wants

25 right now, he will force it, and "forcing it" means forcing his

1   penis into her anus.

2       And I have watched the video of the defendant hold the

3   camera directly in front of his daughter's anus so that we have

4   an extreme close-up of her body, which is beaten to a bloody

5   pulp from the last time that he raped her, and he brags to the

6   camera, to whoever he's sharing this with, about the damage that

7   he did to his daughter's body.  He delights in it.  He gets

8   sexual gratification from it.  So this is a case that involves

9   force.

10      But it is also a case in which the victim was oftentimes

11  compliant with what the defendant wanted, and that, her

12  compliance, is in many ways more sinister and more evil than his

13  use of brute force because this girl loved her father, and she

14  sought his love and his attention and his approval by sometimes

15  doing what he wanted because she never knew any other life.

16      And so the image that sticks with me is the image of the

17  defendant cradling his daughter's face in his hand and kissing

18  her on top of her head.  It is an act that is universally -- it

19  is an act that is universally understood as an expression of a

20  father's love.  And while he is doing that, he is raping his

21  daughter.

22      He gave her a necklace and told her that it contained a

23  camera so that if she told anyone at school what he was doing to

24  her, he would know.  This is a man who manipulated this girl and

25  went to enormous lengths to continue to commit this crime until

1  Chris Thomas rescued her from that house.  He knew what he was

2  doing was wrong, and he should never see the light of day.

3      This is Bianca.  Special Agent Thomas took this photo about

4  two weeks after he rescued her.  And despite everything that she

5  endured her entire life, you can see the innocence and the

6  sweetness in her face.  She's a 6-year-old girl.

7      The evil that the defendant inflicted on her is too big for

8  this courtroom.  It is too big for the sentencing guidelines.

9  He's a 59 on a scale of 43.  The evil that the defendant

10 inflicted on Bianca is too big for any of us to understand, but

11 what I am confident in is that he should go to prison for the

12 rest of his days for the crimes that he's committed, not a day

13 less.  We ask you to sentence him to 120 years.

14      Thank you, Your Honor.

15          THE COURT:  All right.  I'm going to take a quick

16 break.  I'll see everybody here in ten minutes.

17          (Recess at 11:04 a.m. until 11:15 p.m.)

18          THE COURT:  Thank you.  You can be seated.

19      Mr. Whalen, would you like to make your presentation?

20          MR. WHALEN:  Yes.  Thank you, Your Honor.

21      I can't help but be struck by the parallels between the

22 victim in this case and the defendant.  The defendant was

23 sexually abused as a child.  He acted out.  He got in fights.

24 He started using drugs, using alcohol at an early age.

25      He wasn't sent to a foster home.  He was ultimately sent to

1   the Texas Youth Correctional Facility, where he was exposed to

2   other criminal activity.  I can't help but wonder if things

3   might have been different if Mr. Crook had had the opportunity

4   to be placed with someone like Ms. Thomes, if he'd had the

5   opportunity to have the type of counseling and therapy that his

6   own victim is going to receive.

7        Surely, there were signs when Mr. Crook was a youth that

8   something was amiss, signs very similar to those that school

9   authorities were beginning to notice in the victim in this case,

10  you know, excessive absenteeism, an inability to sit still,

11  aggressive behavior at school.

12       Instead, no one in Texas bothered to ask Mr. Crook the

13  critical question, "What's happening to you at home?"  Instead,

14  he was prescribed Adderall for ADHD, a common label placed on

15  children that misbehave at school.  He was referred to various

16  psychiatrists and psychologists and counselors and placed on a

17  plethora of medication over the years.

18       Mr. Crook, and this is where I think his low intellectual

19  functioning is important, Mr. Crook was not capable of getting

20  help on his own.  He wasn't capable of telling anyone what was

21  happening to him.

22       There's an extra stigma, I think, for a young boy who is

23  raped, whether it's by his father or by someone else.  The shame

24  and the stigma that's associated with that is so overwhelming

25  that boys are even more reluctant to tell.

1        Most of us, when we're growing up, we look to our parents

2   for examples.  You know, we see our parents getting up and going

3   to work every day and bringing home a paycheck, and we learn

4   about a work ethic.  We see our parents love each other, and we

5   begin to understand that the essence of intimate relationships

6   is love, not manipulation and not dominance.  We look at our

7   parents and see how they function with their friends and how

8   they deal with life's routine problems.

9        Mr. Crook did not have that opportunity growing up.

10  Mr. Crook grew up in a den of deviance where the adults in his

11  life loafed around all day.  They were drunk every day by 5

12  o'clock in the afternoon.  They smoked crack.  They smoked meth.

13  And they tolerated having their children live in the most

14  deplorable conditions.

15       Mr. Crook not only was dealing with the trauma of being

16  sexually abused, but he was also dealing with a type of grinding

17  poverty that could wear down the strongest person, let alone a

18  person who is of low intellectual functioning like he was.

19       Mr. Crook lived in a house that was so filthy that when

20  social workers came, they had to wear respirators in order to

21  tolerate the smell.  It was a house where animal feces and human

22  waste littered the house.

23       It is no wonder that Mr. Crook has ended up in court here

24  today.  Mr. Crook was programmed in a way by the behavior that

25  he saw modeled in his young life to believe that this type of

1   sexual deviancy was normal.

2        That's not to say that he didn't know that it was wrong.

3   You know, when Agent Thomas came and arrested him or was

4   conducting the search of the residence, Mr. Crook said, "Put me

5   in cuffs and take me to jail."  Clearly, he knew that society

6   did not approve this type of behavior.

7        But things are imprinted on us before society gets an

8   opportunity to imprint messages, and those are messages that are

9   imprinted by our parents and those that we're closest to, the

10  people that are supposed to love us and take care of us and

11  protect us.  Mr. Crook got quite a different message from those

12  people that were supposed to be doing that for him.

13       Mr. Crook did not receive any type of treatment or therapy

14  as a child for what was happening to him.  He will have the

15  opportunity to have that sort of treatment when he's

16  incarcerated.  And, in fact, he has asked me to ask the Court,

17  when sentencing him, to make a recommendation that he be sent to

18  Pekin because he's heard that that's an institution that has sex

19  offender treatment.

20       I think this also has implications for the Court's

21  consideration of the factors the Court's required to consider

22  under 3553(a), the type of treatment, the type of facilities

23  that are available.

24       The other thing that's going to be available, whether

25  Mr. Crook likes it or not, is when he gets near the end of his

1  sentence, however long that sentence is, assuming that the Court

2  gives him a sentence that would allow him to be released before

3  he dies, he's going to be subject to sex offender commitment.

4  So if when he is about to be released from prison they conduct

5  an evaluation and they conclude that despite his advanced age he

6  is still a danger to reoffend, the Government has the option of

7  moving to have him committed as a sexual predator.

8      You know, this is not an imaginary threat.  This is

9  something that's very real.  It's something that happens all the

10 time.  I talk to my colleagues who are located in federal

11 defender offices near institutions that have sex offender

12 treatment programs, and this is something that they regularly do

13 is to represent people in these sexual commitment proceedings.

14     So if the Court grants our request and sentences Mr. Crook

15 to 60 years in prison, which would mean he would be about 79

16 years old when he's released, if there is still a danger at that

17 late point in his life that he could reoffend, the Government

18 has another remedy for that.

19     One of the -- you know, the overarching requirement of

20 Section 3553(a) is that the Court consider whether the sentence

21 imposed is sufficient but not greater than necessary to

22 effectuate the overall goals of the statute.  One of those

23 goals, obviously, and I think it's probably the goal that is

24 paramount in the Court's mind and in the mind of the Government,

25 is the protection of the community from further crimes by the

1  defendant.

2      This defendant is not someone who is going to benefit from

3  the new good time calculations, the new methods of calculating

4  monthly good time, the new procedures for getting inmates

5  additional credits against their sentence.  He's prohibited by

6  statute from benefiting from those.  So at most, he may receive

7  around four days a month of good time credit, which, given that

8  he's now 29 years old, would mean that he would be 79 years old

9  when released from prison.

10     And although I know we've dealt with a lot of emotional

11  material this morning, the statistics show that individuals over

12  the age of 60 only have about a 16 percent recidivism rate

13  across all offenses, and of those people who do recidivate,

14  fewer than 2 percent -- I don't remember the exact number, it's

15  in my brief, I think it's around 1.9 percent -- reoffend by

16  committing a rape.  So the likelihood that Mr. Crook would

17  commit another crime of this type when he is released at the

18  ripe old age of 79 is statistically very remote.

19     Also, common sense tells us that, as men age, their

20  testosterone levels decrease, their sexual activity decreases.

21  So it's very unlikely that Mr. Crook would be prone to

22  reoffending when he's released, but if he is, and the BOP will

23  conduct an evaluation to assess this in the year or two before

24  he would be scheduled for release, the Government always has the

25  remedy of having him committed as a sexual predator.

1    You know, Mr. Crook's low intellectual functioning I think

2 also factored in to this offense in other ways.  Mr. Crook

3 clearly knew that what he was doing was wrong, but I do think

4 that there was a question in his mind as to whether this was

5 really morally wrong, and he seemed to be hung up on this idea

6 of whether force was used.

7    When he's been questioned by the law enforcement officers,

8 a big point of distinction in his mind was that he didn't force

9 the child.  Now, I think that this shows a real unawareness on

10 his part of the disparity between the power of an adult male and

11 a 6-year-old child, but I think it also shows that somehow he

12 had gotten this notion in his head that if you don't force

13 someone to do this, you're not -- you're not as culpable as you

14 would be otherwise.

15    And, again, I think this is something that goes back to his

16 origins.  He lived in an environment where this seemed to be the

17 norm, and that cannot help but have had an effect on the way he

18 viewed his relationship with the victim in this case.

19    What the Court has heard today from the Government is

20 primarily an appeal to the Court's emotions.  I have rarely

21 heard such an appeal to moral principles and moral judgment as I

22 heard here in this court today.  Fortunately, the statutes that

23 govern the Court's decisions bring us back to a more calm way of

24 looking at this, and that is to weigh all of these factors and

25 decide what sentence is sufficient but not greater than

1  necessary to effectuate those goals.

2      I think taking into account the defendant's age, the

3  treatment options that are available to him in prison, the other

4  remedies that the Government potentially has upon his release to

5  deal with him if he is still deemed to be a risk by experts at

6  that point, and I think also factoring in the fact that he did

7  agree to plead guilty in this case, I think that a sentence of

8  60 years would be the appropriate sentence in this case, and we

9  respectfully request that the Court impose such a sentence.

10     We would also request that the Court make a recommendation

11 to the Bureau of Prisons that Mr. Crook be confined at Pekin,

12 Illinois.  I made Mr. Crook aware of the fact that, you know,

13 the Court can make these recommendations, but his ultimate

14 placement is up to the Bureau of Prisons.

15     Thank you, Your Honor.

16         THE COURT:  Thank you, Mr. Whalen.

17     Mr. Crook, this is the time in the hearing when you can say

18 what you might want to say to me or the people that are here.

19 You don't have to say anything, but is there anything you'd like

20 to say at this time?

21         THE DEFENDANT:  Not anything that I can think of.

22         THE COURT:  Okay.  Then in determining an appropriate

23 sentence in this case, I have considered all of the factors

24 under 3553(a), as well as the advisory guidelines and the

25 statutory penalties that are available.

1    Defendant's crime has been discussed at some length today.

2 It was horrific.  I don't think anyone in this courtroom would

3 argue otherwise.  Defendant began anally raping his daughter

4 when she was six months old or less than six months old,

5 according to his recordings.  He continued to do so up until she

6 was removed from his care when she was 6.  He videotaped a

7 number of these encounters and live broadcast other encounters.

8    I think everybody who's been involved in this case has a

9 moment that sticks with them most particularly.  Mr. Krickbaum

10 has his moment.  I'm sure Mr. Whalen has his moment.  I think

11 probably the case agent has his moment.

12    The moment that was most disturbing for me was that when

13 the teachers finally raised a red flag, the defendant and his

14 girlfriend, the child's mother, pulled her out of school and

15 began, quote, homeschooling her.  And that was, to me, one of

16 the most horrible parts about this case, that we had teachers

17 who cared enough to finally say something, we had this almost

18 confrontation between a teacher and DHS where this teacher did

19 not want this child returned to the home, wanted her to be safe,

20 and she was taken and returned to the home, and then she was,

21 quote, homeschooled.  And this is after the incident where the

22 defendant tells her she's got a camera in her necklace so that

23 he can spy on her.

24    And she's returned to the home where she is locked into her

25 room, as she has been previously, as DHS has found previously,

1   and the defendant continues to rape her.  I think about how

2   helpless that must have made her feel.  The one lifeline she had

3   is now gone, and she is now completely at the mercy of this man

4   who she both loves and fears.

5       So we have basically six years of the defendant raping this

6   child, and before that, we know from the undisputed history in

7   this case that the defendant was raping and sexually abusing his

8   brother and his sister from the time he was quite young.

9       So beginning when he was 12 and his little brother was 4,

10  he was sexually abusing that brother.  And when he was found to

11  be doing so and just temporarily removed from the home, he was

12  returned to the home where he picked right back up again abusing

13  that brother and his sister until at age 16 he was adjudicated

14  for sexually abusing that brother, who was by then age 9, and

15  his sister, who was by then age 6, and removed from the home.

16      And so we know we've got there another four-year period

17  where the defendant is busy raping children.  So now we've got a

18  ten-year -- 10 years out of the defendant's 29 years that we

19  have documented that the defendant has been raping children.

20      And there's no question here that the defendant himself was

21  a victim and that he is owed sympathy for that fact, that his

22  father horrifically abused him.  There's no question that

23  Defendant's childhood was misery; that it was peppered with DHS

24  referrals, that he lived a neglected, impoverished childhood in

25  these -- I think Mr. Whalen describes it as grinding poverty.  I

1   agree.  That's what it is.  It's these horrible situations where

2   his parents are drug abusers, they're not paying any attention

3   to their children, they're living in these homes without heat or

4   running water, there's feces everywhere.

5       One of the reports said there were 20 dogs living in the

6   home, there wasn't fresh water, there wasn't fresh food.  They,

7   as Mr. Whalen said, have to wear these respirator masks to even

8   go into the home.  And in addition to being sexually abused, the

9   defendant is being physically abused.

10      There's no real shock here that the defendant has confused

11  issues on family sexuality, on, you know, how one lives, how one

12  is supposed to be living.  There's no real shock here that he

13  has some intellectual disabilities given that it's very, very

14  likely that he didn't receive, you know, when his mother was

15  pregnant with him, prenatal care.  It's very likely that she

16  continued to use drugs while she was pregnant with him.  It's

17  very likely he received little by way of assistance in the home

18  with education or training or anything else.

19      Defendant has real mental health issues.  Now, it's hard to

20  understand what those mental health issues truly are because the

21  defendant has spent nearly as long feigning and exaggerating

22  symptoms as he's had mental health problems.  It's not just our

23  case where the defendant did these kinds of things.  He did it

24  to obtain Social Security benefits.  He's done it in other

25  cases.  This isn't new for him.

1     So I don't have any doubt that he has serious mental health

2  issues.  The problem is I don't know how serious they are.

3  Nobody really does because he is so very persistent about

4  malingering.

5     Defendant has borderline intelligent functioning.  Again, I

6  don't have any question that that's true, but, boy, he's sure

7  good at doing what he wants to do.  This raping of his daughter

8  was insidious and it was thoughtful.  It required him to

9  manipulate things like convincing her that this necklace had a

10  listening device in it, a camera in it; like thinking through

11  the strategy of pulling her out of school and putting her in

12  homeschool; like running a Web -- the Live.me page so that he

13  could broadcast his rapes of his daughter to other people who

14  might be interested; like convincing the mother of the girl to

15  try and get her to make certain reports to his lawyers or to

16  doctors or to investigators to assist with his ruse about his

17  mental health struggles.

18     All of these would indicate high-level, or higher level,

19  intellectual functioning rather than lower level, but certainly

20  he has a long pattern of what appears to be true intellectual

21  functioning.  So he's clearly got intelligence where he needs it

22  and then some deficiencies in other areas.

23     So, again, he's hard to figure out.  And you put -- you

24  know, you put all that together, and you have this very

25  complicated man.  And I can feel empathy for Steven Crook the

1   child who had a horrific childhood, who was himself let down by

2   the system, who has mental illnesses, who has intellectual

3   dysfunction, who has -- you know, who has these horrible things

4   that have happened to him.

5        I can feel sorrow for what he might have been if he had

6   received -- as Mr. Whalen, perhaps, more eloquently puts it, if

7   somebody like Ms. Thomes had been there in his life at the right

8   time, if the right prosecutors and case agents and defense

9   attorneys and judges had been involved in finding and helping

10  him at the right time in his life.  I can feel sorrow for what

11  he might have been.

12       But he was not rescued, and he's now 29, and he is

13  unquestionably dangerous to the community.  And we can't expect,

14  given the pattern that he's shown, that he is going to learn or

15  grow or change.  He has spent nearly a third of his life, as

16  near as I can tell, raping children, and I can't give him any

17  additional chance to do so.

18       The safety of the community hinges upon him never being

19  able to be around another child because if even his own children

20  are not safe, even his own brother and sister are not safe, if

21  he doesn't understand that a six-month-old child is incapable of

22  consent, let alone the fact that he's the child's parent, then

23  we can't begin to work with this person.  And he's so dangerous,

24  so very dangerous.

25       So at the end of the day, the only sentence that I can see

1 as appropriate in this case is one that under 3553(a) protects

2 the safety of the community, and that is a sentence of 30 years'

3 imprisonment on each of the four counts, with those sentences to

4 run consecutively to one another, or back to back.  That is a

5 sentence of 120 years if you add it up in year terms.

6     In the event, for some reason, the defendant is released

7 from prison because of a statutory change or some other issue

8 that arises, he'll be on supervised release for the rest of his

9 life.

10     So that's a term of 30 years' imprisonment on each of

11 Counts 1, 15, 21, and 23, with those sentences to run

12 consecutively.  I'll recommend he be placed in Pekin, Illinois,

13 if he qualifies for that particular institution.

14     He'll then have a term of life on supervision, if that

15 kicks in, on Counts 1, 15, 21, and 23.  Those terms will run

16 concurrently, at the same time.

17     The terms and conditions of supervised release were set

18 forth in the Presentence Investigation Report, and I do adopt

19 those particular conditions.

20     I also add two extra conditions in the event, as I said,

21 the defendant is ever released.  The first is that if the

22 defendant is ever released for any reason from prison, he will

23 go into a halfway house setting throughout the term of

24 supervision with GPS monitoring or its future and modern

25 equivalent of GPS monitoring.  If the defendant somehow makes it

1   back into the community, I or whatever judge is in charge of

2   monitoring him in the future will need to know where he is at

3   all times.

4        And the second added condition is that he be evaluated for

5   sex offender commitment as a sexual predator, whether state or

6   federally, but that that evaluation be done as part of his

7   supervised release.

8        I find the defendant doesn't have the ability to pay a

9   fine, and no fine will be imposed.

10       There has been a restitution request in this case from the

11  victim of the Pink Heart series, the BluesPink series, and the

12  Tara series.  In light of the primary victim and her potential

13  restitution needs, I will only assess $250 for each of the

14  victims in these series.

15       So there are two victims in the Pink Heart Sisters series,

16  there are two victims in the BluesPink series, and one victim in

17  the Tara series, so that adds up to be -- it should be $2,500

18  [sic] total between those five victims.

19       I do find, under the factors of the Supreme Court's

20  Paroline case, that this is a reasonable amount of restitution

21  based upon their victim impact statements, based upon prior

22  cases in which I've had restitution requests in these cases, my

23  general familiarity with the number of defendants who have

24  possessed these particular images, the number of future

25  potential defendants regarding these images -- these are three

1  of probably the most popular series out there -- and the

2  defendant's relative culpability in possessing these images.  I

3  do find he proximately caused harm in the amount of $250 to each

4  of these victims.

5      And I only make this finding because of the primary victim

6  in this case.  Ordinarily, I would be making a more generous

7  restitution amount for these particular victims.

8      I do find the defendant cannot pay interest on this

9  restitution amount, and so interest will not be applied.

10      In the event restitution is sought by the primary victim in

11  this case, we can do an amended judgment, but we need to get to

12  that sooner rather than later, and we can look at reprioritizing

13  some of these victim requests at that time.

14      In light of the restitution order, I waive any assessment

15  under the Justice for Victims of Trafficking Act.

16      I do order forfeiture consistent with the Preliminary Order

17  of Forfeiture filed February 12th of 2019.

18      I order the $100 special assessment be paid for a total of

19  $400.

20      Mr. Crook, you have the right to appeal.  If you decide you

21  want to appeal, you just need to let Mr. Whalen know in the next

22  14 days, or two weeks.  If you do want to appeal, Mr. Whalen or

23  his office would take care of that.  It would not cost you

24  anything.  The appeal itself would not cost you anything.

25  Mr. Whalen needs to know in the next two weeks if you want to

1  appeal; otherwise, you forever give up your right to challenge

2  this sentence.

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Mr. Krickbaum, I think we have Counts 2

5  through 14, 16 through 20, 22, and 24 through 33 to be

6  dismissed.

7          MR. KRICKBAUM:  Yes, Your Honor.

8          THE COURT:  And those are now dismissed.

9      I want to thank the people involved in this case.  This is

10  an incredibly difficult case, and I know how hard all of you

11  have worked.  I know how hard this has been on the prosecutors,

12  on the case agent.  I know how hard this has been for

13  Mr. Whalen, for your whole team; the probation office and their

14  whole team; for the marshals who've sat through these hearings

15  which are horrific to listen to; to the deputy clerks who have

16  staffed my hearings and the magistrate judge's hearings; the

17  court reporters who staffed my hearings and the magistrate

18  judge's hearings.

19      To everybody who's helped on any piece of this case, these

20  are very difficult cases in general, and this one in particular

21  was very, very hard.  And so I know that we all took on these

22  jobs understanding that there would be cases like this that

23  ended up before us, but it doesn't mean that we don't all have

24  nightmares sometimes, and so I appreciate all of the

25  professional work done by all of you in these cases like this

1    one.

2         I appreciate how hard you worked together to get this case

3    across the finish line, and so I wanted to thank all of you for

4    that work.

5         Mr. Krickbaum, anything else we need to do today?

6              MR. KRICKBAUM:  No.  Thank you very much, Your Honor.

7              THE COURT:  Mr. Whalen?

8              MR. WHALEN:  No.  Thank you, Your Honor.

9              THE COURT:  Okay.  Anything from probation we need to

10   clarify?

11             THE PROBATION OFFICER:  No, Your Honor.

12             THE COURT:  Okay.  We are adjourned.

13             (Proceedings concluded at 11:45 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2        I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the

3    State of Iowa and Federal Official Realtime Court Reporter in

4    and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11       Dated at Des Moines, Iowa, this 6th day of July, 2019.

12

13

14                        /s/ Kelli M. Mulcahy
                          Kelli M. Mulcahy, CSR, RDR, CRR
15                        Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25